701 P.2d 571

**STATE of Arizona, Appellee,**

v.

**Roy Raul SANCHEZ, Appellant.**

**No. 6499–PR.**

Supreme Court of Arizona,
En Banc.

June 18, 1985.

HAYS, Justice.

Respondent, Roy Raul Sanchez, was tried by a jury and convicted of escape in the third degree. A.R.S. § 13–2502. At the time of this incident, respondent was on probation from a prior conviction for aggravated robbery. A.R.S. § 13–1903. At sentencing, the trial judge revoked respondent's probation and ordered him to serve 3.75 years for aggravated robbery and 2.25 years for escape. Pursuant to A.R.S. § 13–604.01(B), the trial judge imposed consecutive sentences. Respondent appealed.

The Court of Appeals reversed respondent's conviction. It ordered the trial judge to enter a judgment of acquittal on the escape charge. *State v. Sanchez*, 145 Ariz. 339, 701 P.2d 597 (App.1985). The state petitioned for review. Sanchez filed no response. We have jurisdiction pursuant to Ariz.Const. art. 6, § 5(3), A.R.S. § 13–4032 and 17 A.R.S. Rules of Crim. Proc., Rule 31.19.

The state raises only one issue:

Did the court of appeals err in concluding that respondent did not commit escape in the third degree when he ran from a police officer after being told that he was under arrest?

FACTS

At about 10:30 p.m. on the evening of June 3, 1983, Officer John Ellsworth, a police officer for the City of Casa Grande, was in a marked police car parked at a McDonald's Restaurant in Casa Grande. He was watching traffic when he observed a 1963 Chevrolet automobile turn into the restaurant's drive-through service. He observed respondent, whom he knew from previous encounters, seated in the front passenger seat of the car. When Ellsworth made eye-contact with the respon-

dent, respondent appeared to "duck away," arousing Ellsworth's suspicions. Ellsworth used his car radio to inquire if there were any outstanding warrants for respondent.

By the time he received information that there was an outstanding misdemeanor warrant for respondent, the Chevrolet was leaving. Ellsworth followed and radioed for additional help. Ellsworth testified, "I went ahead and called for additional units, because I figured he's run before, and I didn't want to try to chase him by myself. So I asked for another unit."

The Chevrolet pulled into the parking lot of another fast food restaurant, followed by Ellsworth, who then put on his flashing red lights. The Chevrolet came to a stop, but before Ellsworth could get out of his car, respondent got out of the Chevrolet and walked over to another occupied vehicle and began talking with its driver. Ellsworth went over to speak to the driver of the Chevrolet.

Ellsworth, stalling for time until the other officer arrived, talked with the Chevrolet's driver and kept an eye on respondent. When it appeared that respondent was going to get into the other car, Ellsworth started walking towards him. Ellsworth said, "Roy, come here. I need to talk to you."

Respondent walked around the rear of the second automobile and, as Ellsworth approached, respondent went to the front of the automobile. When Ellsworth headed toward the front of the car, respondent retreated to the rear. This pursuit continued until Ellsworth said, "This is it, Roy; you're under arrest." Respondent, who was 10 to 15 feet from Ellsworth, then "took off running." Ellsworth pursued respondent but was unable to apprehend him. Other officers were brought in and eventually respondent was captured and charged with escape in the third degree.

At trial, respondent claimed that Ellsworth never told him that he was under arrest. Respondent testified that he and

Ellsworth had prior run-ins and that during one of those encounters, Ellsworth used excessive force. He stated that he fled because he believed Ellsworth intended to hurt him.

## ESCAPE

The Court of Appeals held that there was no escape. Despite the fact that the officer told respondent that he was under arrest and chased him for some distance, the court declined to find that the officer established the requisite custody.

At the time in question[1] A.R.S. § 13–2502(A) provided:

A person commits escape in the third degree if, having been arrested for, charged with or found guilty of a misdemeanor or petty offense, such person knowingly escapes from *custody* (emphasis added).

According to the definitions section[2] (A.R.S. § 13–2501(3)) "custody" means:

the imposition of actual or *constructive restraint* pursuant to an on site arrest or court order … (emphasis added).

Since the officer in the case at bar was never able to approach respondent closer than 10 to 15 feet, we agree that there was no actual restraint. We differ from the Court of Appeals, however, as to whether there could be "custody" through constructive restraint.

Before this case, the term "constructive restraint" remained to be defined. *Cf. State v. Newman*, 141 Ariz. 554, 558, 688 P.2d 180, 184 (1984) (specifically declining to define constructive restraint). Thus, in defining this term, the Court of Appeals naturally looked to other jurisdictions for guidance. *State v. Sanchez, supra*, 145 Ariz. at 340, 701 P.2d at 598. These jurisdictions, however, did not define the term "constructive restraint" for the purposes of custody. Rather, they defined the term "constructive seizure or detention" for purposes of arrest. *See State v. White*, 209

1. A.R.S. § 13–2502 was subsequently amended.

2. "Custody" is similarly defined in A.R.S. § 31–341(2).

Neb. 218, 306 N.W.2d 906 (1981); *Bey v. State*, 355 So.2d 850 (Fla.App.1978). In Arizona, however, the technical requirements of *arrest* do not allow for "constructive seizure or detention." *See* A.R.S. § 13–3881(A).

In Arizona, arrest is only accomplished "by an actual restraint of the person to be arrested, or by his submission to the custody of the person making the arrest." A.R.S. § 13–3881; *see also State v. Sanders*, 118 Ariz. 192, 195, 575 P.2d 822, 825 (App.1978) (arrest not complete until individual's liberty of movement interrupted). Yet we are told that "constructive restraint incident to on-site arrest" is one way in which custody, for the purposes of our escape statute, is established. The question this poses is whether a person can be in custody, and thereafter commit escape, without ever having been been technically arrested—without having been under actual restraint of the officer or having submitted to the officer's authority. *Cf. State v. Susko*, 114 Ariz. 547, 549, 562 P.2d 720, 722 (1977) (distinguishing between technical arrest and full "custody" arrest). We believe they cannot and hold that an individual must be under arrest before he or she can escape.

While it is initially attractive to say that the person who runs after being told he is under arrest, commits escape, we believe that this construction—allowing escape prior to technical arrest—must fail.

There is evidence that the legislature may never have intended these escape statutes to criminalize flight prior to arrest. The Arizona Criminal Code Commission proposed a set of escape statutes quite similar to those adopted by our legislature. In their commentary, the Criminal Code Commission writers noted:

> Neither [nonviolent] nonsubmission nor flight are covered by these sections [resisting arrest and escape]. The proper course in such a case is to pursue or use reasonable force to overcome the suspect.

Arizona Criminal Code Commission, Arizona Revised Criminal Code, p. 238 (1975).

*Cf. State v. Swanson*, 34 Or.App. 59, 578 P.2d 411 (1978) (Oregon, having similar statutes and a similar code commentary, held nonviolent flight from *attempted* arrest not to be criminal).

The Model Penal Code, explicitly chose not to criminalize nonviolent flight from arrest. It stated:

> When the arrest is made, prosecution may be had for the original offense. If the arrestee is innocent of that crime, it may well be thought unfair to punish him for spontaneous flight or some other reflexive act of resistance that does not risk breach of the peace. More to the point, authorizing criminal sanctions for any effort to avoid arrest would invite grave abuse. Minor acts of evasion and resistance are sufficiently ambiguous to give rise to honest error, sufficiently elusive to encourage false allegations, and sufficiently commonplace to afford general opportunity for discriminatory enforcement.

Model Penal Code and Commentaries, § 242.2, p. 214 (1980).

Finally, were we to hold that a person could escape without being technically under arrest, we would face an uneven application of these statutes. For example, consider the common situation where an officer sees a person committing a misdemeanor, tells him he is under arrest and the person flees. The person did not commit escape. This is because the potential escapee must come to the arrest-flight encounter with certain prerequisites. In the case of escape, in the third degree, for example, the escapee must have previously been "arrested for, charged with or found guilty of a misdemeanor or petty offense" and then commit the escape. In our example, since the person had not yet been technically arrested, he could not be found guilty of escape in the third degree—he did not come to the encounter having been "arrested for, charged with or found·guilty of."

Contrast this with the individual in the case at bar. Since there was a warrant out for his arrest, he had been "charged with"

and of course could be convicted for the same behavior that the person in our first example could not. [Respondent had run a red light, failed to appear for jail time and a bench warrant was issued.] Thus, short of substantially broadening our definition of arrest, finding constructive restraint in the case at bar would create more problems than it would solve.

We invite the legislature to consider this problem and determine whether flight from *attempted* arrest should be criminalized. *Cf.* Ark.Stat.Ann. § 41–2822 (Fleeing); *Tennessee v. Garner,* — U.S. —, 105 S.Ct. 1694, 1701 n. 9, 85 L.Ed.2d 1 (1985) (to extent that threat of use of deadly force becomes less effective, the threat of punishment for flight may become more important). We decline, however, to judicially legislate that result. Consequently, we believe that a person must be under arrest before he can commit escape. We read "constructive restraint" to mean those situations where the arrest has already occurred, the process of taking the arrestee to police station or judge commenced, and the suspect flees. In this context, the suspect is under no actual restraint, but, for the purposes of the escape statute, should be considered under "constructive restraint."

The opinion of the Court of Appeals is vacated. The trial court is ordered to enter judgment of acquittal.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.