## STATE OF CONNECTICUT *v.* KEITH LAWS
## (12860)

FOTI, HEIMAN and HENNESSY, Js.

Argued September 29, 1994—decision released March 21, 1995

*G. Douglas Nash,* public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Gerard P. Eisenman,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction, rendered following a jury trial, on a seven count information. The defendant was convicted of threatening in violation of General Statutes § 53a-62 (a) (1),[1] carrying a pistol without a permit in violation of General Statutes § 29-35,[2] criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 1991) § 53a-217,[3] two counts of interfering with an officer in violation of General Statutes § 53a-167a,[4] using a motor vehicle without the owner's

---

[1] General Statutes § 53a-62 provides in relevant part: "(a) A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ."

[2] General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his person, except where such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28."

[3] General Statutes (Rev. to 1991) § 53a-217 provides in relevant part: "(a) A person is guilty of criminal possession of a pistol, revolver or electronic defense weapon when he possesses a pistol, revolver or electronic defense weapon and has been convicted of a capital felony, a class A felony, a class B felony, except a conviction under section 53a-86, 53a-122 or 53a-196a, a class C felony, except a conviction under section 53a-87, 53a-152, 53a-153 or 53a-196b, or a felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216. . . ."

[4] General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties."

permission in violation of General Statutes § 53a-119b,[5] and escape from custody in violation of General Statutes § 53a-171.[6] On appeal, the defendant claims that (1) his conviction for escape from custody is not supported by the evidence, (2) the trial court improperly instructed the jury as to an essential element of the crime of escape from custody, (3) his convictions of carrying a pistol without a permit and criminal possession of a pistol violate the state and federal constitutional prohibitions against double jeopardy, and (4) the trial court improperly instructed the jury on an alternate means of committing interference with an officer that was not supported by the evidence. We affirm the judgment of the trial court.

The following facts could reasonably have been found by the jury. On May 15, 1992, at 12:30 p.m., Officer Michael Atkins of the Bridgeport police was patrolling the west side of Bridgeport when he was informed that there was a man carrying a gun on Yale Street. Atkins radioed in and went to investigate. Atkins observed the defendant on Wordin Avenue and motioned for the defendant to approach the patrol car. The defendant approached the patrol car while fumbling with something under his sweatshirt. Suspecting that the defendant might be armed, Atkins exited the cruiser without turning it off or removing the keys from the ignition. He walked toward the rear of the cruiser, keeping the vehicle between himself and the defendant. When Atkins circled the cruiser, the defendant began to run south on Wordin Avenue, and Atkins pursued him.

---

[5] General Statutes § 53a-119b provides in relevant part: "(a) A person is guilty of using a motor vehicle without the owner's permission when: (1) He operates or uses, or causes to be operated or used, any motor vehicle unless he has the consent of the owner . . . ."

[6] General Statutes § 53a-171 (a) provides: "A person is guilty of escape from custody if he escapes from custody."

As they were running, the defendant pointed a gun at Atkins and yelled at him to get back. Atkins fell to the ground. He then got up, drew his gun and continued to pursue the defendant. The defendant again turned and pointed his gun at Atkins, and the chase continued. The defendant turned onto Hanover Street and Atkins lost sight of him.

As Atkins searched for the defendant, he heard dogs barking in the rear yard of 46-50 Wordin Avenue. As he entered the yard, he was joined by fellow officer Michael Muckro. Muckro was responding to Atkins' earlier radio call. He had seen Atkins' cruiser sitting in the middle of Wordin Avenue with the engine running. A bystander pointed in the direction that the defendant and Atkins had run. When Muckro saw Atkins in the yard of 46-50 Wordin Avenue, he exited his cruiser and joined him.

The officers noticed that the barking dogs were looking up to the second and third floor porches of the house at 46-50 Wordin Avenue. Atkins and Muckro decided to climb the back stairs of the house. With Atkins in the lead, they reached the third floor and Atkins saw the defendant's foot on the porch. Atkins pointed his gun at the defendant and yelled for him to freeze. The defendant yelled something in response. Atkins ordered the defendant to show his hands. The defendant said that he did not have anything, and Atkins proceeded onto the third floor porch.

On the porch, Atkins found the defendant with both legs over the railing, apparently preparing to jump. While still pointing his gun, Atkins told the defendant he was under arrest. Atkins then reholstered his weapon and grabbed the defendant by his sweatshirt. The defendant broke away and jumped from the porch, landing on the hatchway to the cellar. Atkins remained on the third floor porch holding the hood that had ripped off of the defendant's sweatshirt.

Atkins and Muckro ran down to the backyard and searched for the defendant. Someone from an adjacent house approached the officers and told them that the defendant had run toward the front of the house. Atkins and Muckro returned to the house to search for the gun. As they searched, they heard police sirens and saw police lights heading up the street.

On Wordin Avenue, a cruiser driven by Officer James Sheffield was responding to the scene. As Sheffield turned from State Street onto Wordin Avenue, he saw the defendant jump into Atkins' cruiser, which was still running, and speed off. Sheffield and Officer Ronald Henderson, who arrived in another cruiser, chased the defendant. The defendant hit two parked cars and a fence with Atkins' cruiser and then the engine stalled. Henderson and Sheffield exited their cruisers and attempted to get the defendant out of Atkins' cruiser, but the defendant locked the doors. After unsuccessfully attempting to smash the cruiser windows with a nightstick, Henderson drew his gun and shot out the rear window of the cruiser.

The defendant restarted Atkins' cruiser and sped away. Henderson and Sheffield returned to their own cruisers and resumed the chase. On Bird Street, in the P.T. Barnum apartment complex, the defendant jumped out of the moving cruiser. The cruiser continued onto a sidewalk where it hit a barrier and stopped. The defendant disappeared behind a building and was not apprehended until three weeks later.

## I

The defendant's first claim on appeal is that there was insufficient evidence for the jury to have convicted him of escape from custody. He argues that (1) he was never in custody for the purposes of General Statutes § 53a-171, (2) the state failed to prove that he had the requisite intent to escape from custody, and (3) the

state failed to prove that he was in custody pursuant to a court order or an arrest for robbery. The defendant concedes in his brief that these claims were not raised in the trial court. He asserts reviewability under *State* v. *Evans*, 165 Conn. 61, 69–70, 327 A.2d 576 (1973), and *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. See *State* v. *Adams*, 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993).

"When reviewing sufficiency of the evidence claims, we impose a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 32 Conn. App. 193, 200–201, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993). " 'In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' " *State* v. *Salz*, 226 Conn. 20, 31, 627 A.2d 862 (1993).

## A

Section 53a-171 provides that "[a] person is guilty of escape from custody if he escapes from custody." Custody is defined by General Statutes § 53a-168 (2) as "restraint by a public servant pursuant to an arrest or court order . . . ." The substitute information filed by the state in this case alleged that "on the 15th day of May, 1992, at or about 12:30 p.m. at 46-50 Wordin Avenue, Bridgeport, [the defendant], while charged with the crime of Robbery in the First Degree, a felony,

did escape from custody, in violation of Section 53a-171 (a) of the Connecticut General Statutes." The defendant argues that Atkins' telling him he was under arrest and grabbing his sweatshirt hood did not constitute "restraint by a public servant pursuant to an arrest." General Statutes § 53a-168 (2). The defendant urges us to find that custody is not complete merely upon the utterance of words of arrest by a police offi-. cer. The defendant claims that it is necessary for a police officer to exercise control over the defendant before the defendant is in custody from which he can escape in violation of § 53a-171. We do not agree.

A person who is lawfully placed under arrest is in the legal custody of the police. See *State* v. *Blyden*, 165 Conn. 522, 533, 338 A.2d 484 (1973). " 'Precisely when an arrest occurs is a question of fact which depends on an evaluation of all the surrounding circumstances.' " *State* v. *Derrico*, 181 Conn. 151, 158, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). " 'To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.' " Id., 159.[7]

The defendant did not question that he was actually "arrested." He did not object to the jury instruction that placed on the state the burden of proving beyond a reasonable doubt that he "was placed under arrest by Officer Michael Atkins . . . ."[8] One of the elements

---

[7] We note that we do not have before us as an issue a determination of whether the defendant was "seized" within the meaning of the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution. See *State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992); *State* v. *Ostroski*, 186 Conn. 287, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982).

[8] The defendant, in excepting to the court's charge, never once questioned the arrest. In noting his exception to the court's charge, defense counsel stated: "Thank you, Your Honor. And the other item again, in the escape

that the jury was required to find was that there was an arrest.

"A finding of fact will not be overturned on appeal unless it is clearly erroneous. *State* v. *Pittman,* 209 Conn. 596, 606, 553 A.2d 155 (1989); *State* v. *Young,* 191 Conn. 636, 652, 469 A.2d 1189 (1983); see Practice Book § 4061. Where a constitutional issue turns upon a factual finding, however, this court has applied a stricter standard of review of the factual finding. 'The issue is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. *Columbe* v. *Connecticut,* 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).' *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)." *State* v. *Damon,* 214 Conn. 146, 154, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990).

We conclude, after an examination of the record, that the evidence presented during trial was sufficient to support the conclusion that the defendant was placed under arrest. Certainly, the officer's intention was to effectuate an arrest. The defendant should reasonably have understood that he was not free to leave because he was under arrest when Atkins, a policeman in uniform, pointed his service revolver at him and said "freeze" and "you are under arrest." While nothing further may have been necessary, Atkins also took hold

---

from custody charge, we may have to, at one point, look at that only because it seems as though that when Officer Atkins arrested Mr. Laws it was for an outstanding robbery one and that's not the requirement of the statute. Only that at the time of the commission of the offense there was already pending a charge known to him, so that when Atkins arrested him, he arrested him knowing that he already had a charge of robbery one but he didn't arrest him for robbery one."

of the defendant. Although an argument may be made that the grabbing was not sufficient to exercise "control" over the defendant, we do not deem "control" to be a determining factor for an arrest. The defendant was actually or, at the very least, constructively detained when Atkins pointed his gun at him and told him he was under arrest. We agree that the legislative definition of "custody" in § 53a-168 (2) makes custody a prerequisite to the crime of escape from custody pursuant § 53a-171. We conclude, however, that a formal arrest was completed and, therefore, the defendant was in custody. See *State* v. *Pittman*, supra, 209 Conn. 608. Because the defendant was arrested, he was in custody, and we need not determine whether actual restraint was employed, or whether the defendant submitted to the custody of Officer Atkins.

## B

The defendant also argues that the state failed to prove the requisite intent for an escape from custody. He claims that he fell from the porch and that this fall, being an accident, was not voluntary and did not satisfy the intent necessary to commit escape from custody. The defendant, who elected not to testify on his own behalf, says that the state failed to disprove that he accidentally fell.

No specific intent is necessary to commit the crime of escape. The ordinary intent required to constitute the crime of escape is the intent to voluntarily do the act that results in the unlawful liberation from lawful custody. *State* v. *Roy*, 173 Conn. 35, 46, 376 A.2d 391 (1977). Whether the defendant intentionally jumped or accidentally fell was a question of fact for the jury to decide. Marian Straubel, who lived on Wordin Avenue and was on her back porch at the time of the incident, testified that she "saw someone jump from the third floor, from the porch . . . ." Atkins testified that the defendant was "going over the railing like he was going

to jump . . . ." The evidence was sufficient for the jurors to find that the defendant either fell or jumped. They determined, by their verdict, that he jumped. Although the defendant argues that it was the intent he had when he "left" the third floor porch that matters, this is not true. The jury was free to consider all of his actions before that "departure" to determine whether he intended to jump or if he merely fell. Although it is not essential to our determination, we also note that the defendant continued to evade the police after he reached the ground. This is indicative of his entire pattern of activity, which was aimed at his not being apprehended.[9] The jury's function as the trier of fact is to draw all reasonable and logical inferences from the facts as it finds them to exist. *State* v. *Wideman*, 36 Conn. App. 190, 203, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995).

## C

The defendant further claims that the state did not meet its burden of proving that his arrest was pursuant to a charge of robbery in the first degree, as claimed in the information. We do not agree.

The state's burden of proof for a conviction of escape from custody was to prove that the defendant was in custody, that he escaped from that custody, that the custody was pursuant to an arrest, and, for purposes of classification as a class C felony rather than a class A misdemeanor, that the escape was the result of being arrested for, charged with, or convicted of, a felony. See General Statutes § 53a-171 (b).[10]

---

[9] "For however strong the natural desire of liberty may be, yet every man is bound to submit himself to the restraints of the law." *State* v. *Doud*, 7 Conn. 384, 387 (1829).

[10] General Statutes § 53a-171 (b) provides: "If a person has been arrested for, charged with or convicted of a felony, escape from such custody is a class C felony, otherwise, escape from custody is a class A misdemeanor."

The defendant notes that the only evidence that he had been charged with or convicted of a felony at the time of his escape was by stipulation. The stipulation was that on the date in question there was a charge of robbery in the first degree pending against the defendant. The defendant argues that his stipulation that a charge of robbery in the first degree, a felony, was pending and outstanding, meant nothing unless it was related to the events of May 15, 1992, when the escape occurred.

The stipulation regarding the charge of escape from custody was as follows: "[T]he state and the defendant stipulate that one of the essential elements of the crime to wit: That the defendant . . . had previously been convicted of a felony is hereby stipulated. . . . The state and the defendant stipulate that on May 15, 1992 . . . the defendant ha[d] a pending felony offense outstanding against him and that he was aware of said charges and we further stipulate that since one of the essential elements of that crime is that there be a pending felony offense from another case . . . the pending count [named in the seventh count of the information] being robbery in the first degree." For purposes of § 53a-171 (b), the defendant stipulated not only that the charge of robbery in the first degree was pending and outstanding, but also that this satisfied an element of escape from custody. We conclude that the stipulation was sufficient to relieve the state of any burden of proof relative to § 53a-171 (b) and the outstanding robbery charge, and that the defendant cannot now challenge that stipulation on appeal.

## II

The defendant next claims that the trial court improperly instructed the jury as to an essential element of the crime of escape from custody. He argues that the trial court, in instructing the jury as to the stipulation

of the parties, was required to include as part of the instruction that the jury find proven beyond a reasonable doubt that a court order of some type to take the defendant into custody was outstanding.

We agree that in order to conclude that the jury acted in a fair manner, we must first conclude that a basic instruction was given that included an identification of each and every essential element for which the state has the burden of proof beyond a reasonable doubt. *State* v. *Brown*, 35 Conn. App. 699, 712–13, 647 A.2d 17, cert. denied, 231 Conn. 932, 649 A.2d 254 (1994). Failure to charge on an essential element of a crime is a constitutional defect. *State* v. *Tweedy*, 219 Conn. 489, 510–11, 594 A.2d 906 (1991). As previously discussed, however, the evidence in the form of a stipulation was sufficient to establish that a robbery in the first degree charge was pending and outstanding and that the defendant knew of it when he was placed under arrest by Atkins. Our review of the trial court's instruction leads us to conclude that it was sufficient to enable the jury to consider each and every essential element of the crime of escape from custody.

### III

The defendant next claims that his convictions and the punishments imposed for carrying a pistol without a permit, pursuant to § 29-35,[11] and criminal possession of a pistol, pursuant to § 53a-217,[12] violate the double jeopardy prohibitions of both the federal and state constitutions. We disagree.

The fifth amendment to the United States constitution provides in relevant part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." This provision of the fifth

[11] See footnote 2.
[12] See footnote 3.

amendment applies to the states through the due process clause of the fourteenth amendment; *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); and "prohibits multiple trials for the same offense as well as multiple punishments for the same offense in a single trial . . . ." *State* v. *Gross*, 35 Conn. App. 631, 635, 646 A.2d 933, cert. denied, 231 Conn. 932, 649 A.2d 254 (1994). "Although the Connecticut constitution does not include a specific double jeopardy provision . . . [t]he due process and personal liberty guarantees provided by article first, §§ 8 and 9, of the Connecticut constitution[13] . . . have been held to encompass the protection against double jeopardy." (Citations omitted.) *State* v. *Lonergan*, 16 Conn. App. 358, 363–64, 548 A.2d 718 (1988), aff'd, 213 Conn. 74, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990).

The defendant failed to raise his double jeopardy claim at trial. Nevertheless, he claims he is entitled to review of this claim under the constitutional bypass doctrine of *Evans-Golding*. *State* v. *Golding*, supra, 213 Conn. 233; *State* v. *Evans*, supra, 165 Conn. 61. *Evans-Golding* review of an unpreserved claim is warranted when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Velez*, 30 Conn.

---

[13] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

App. 9, 20, 618 A.2d 1362, cert. denied, 225 Conn. 907, 621 A.2d 289 (1993). "The first and second prongs of the *Golding* test dictate whether an issue will be reviewed, and the third and fourth prongs constitute review of the issue on its merits." *State* v. *Avila*, 223 Conn. 595, 602, 613 A.2d 731 (1992). We will review this claim under *Evans-Golding* because the record is adequate for appellate review and the claim of double jeopardy is of constitutional magnitude. See *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); *State* v. *McCall*, 187 Conn. 73, 89, 444 A.2d 896 (1982); *State* v. *Fudge*, 20 Conn. App. 665, 669 n.3, 569 A.2d 1145, cert. denied, 214 Conn. 807, 573 A.2d 321 (1990).

A

The defendant's federal constitutional claim fails under the third prong of *Evans-Golding*. This court and our Supreme Court have consistently applied the test of *Blockburger* v. *United States*, 284 U.S. 229, 52 S. Ct. 180, 76 L. Ed. 306 (1932), to double jeopardy claims arising from multiple punishments in the course of a single prosecution. *State* v. *McCall*, supra, 187 Conn. 89–90; *State* v. *Truppi*, 182 Conn. 449, 467–68, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981); *State* v. *Russell*, 25 Conn. App. 243, 250, 594 A.2d 1000, cert. denied, 220 Conn. 911, 597 A.2d 338 (1991); *State* v. *Blackwell*, 20 Conn. App. 193, 196, 565 A.2d 549, cert. denied, 213 Conn. 810, 568 A.2d 794 (1989). Pursuant to the *Blockburger* test, "[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Internal quotation marks omitted.) *State* v. *Russell*, supra, 250, citing *Blockburger* v. *United States*, supra, 304. The

*Blockburger* test has been described, however, only as a means for determining the legislative intent that two crimes are the same for double jeopardy purposes. *Albernaz* v. *United States*, 450 U.S. 333, 340, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981). Therefore, if there is a clear indication that the legislature did or did not intend multiple punishments under the relevant statutes, such legislative intent will override the strict application of the *Blockburger* test. Id.; see also *State* v. *Woodson*, 227 Conn. 1, 11, 629 A.2d 386 (1993). The defendant has not brought to our attention any relevant history to indicate that these two crimes were intended to be punished as one.

Employing the *Blockburger* test, we have previously held that conviction and punishment imposed pursuant to convictions for both §§ 29-35 and 53a-217 in a single trial do not violate the federal constitutional prohibitions against double jeopardy. *State* v. *Ortiz*, 15 Conn. App. 749, 751, 546 A.2d 338, cert. denied, 209 Conn. 820, 551 A.2d 757 (1988); *State* v. *King*, 15 Conn. App. 330, 332, 544 A.2d 261 (1988). Thus, in this case the alleged violation of the federal constitutional double jeopardy prohibition does not clearly exist.

B

The defendant's state constitutional claim merits independent scrutiny. "Connecticut courts have consistently followed the double jeopardy analysis used in the federal courts . . . ." *State* v. *Blackwell*, supra, 20 Conn. App. 195. We can find no case, however, where either this court or our Supreme Court has held that the state constitutional protection against double jeopardy parallels the federal constitutional protection. In the past, our election to apply only a federal constitutional analysis to double jeopardy claims has been based on the claimant's failure to provide independent analysis of the state constitutional prohibition against

double jeopardy. See, e.g., *State* v. *Ford*, 33 Conn. App. 143, 145, 634 A.2d 1188 (1993), cert. granted, 228 Conn. 918, 636 A.2d 849 (1994); *State* v. *Russell*, supra, 25 Conn. App. 249; *State* v. *Blackwell*, supra, 195–96. Here, the defendant has presented an exhaustive analysis, employing the criteria enunciated by our Supreme Court in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), as to why our state constitution affords greater protection than the federal constitution in the context of double jeopardy. Therefore, we will address, for the first time, the question of whether the state constitutional bar against double jeopardy is coextensive with the double jeopardy prohibition of the fifth amendment to the United States constitution.

" 'We may find greater protection of individual rights under our state constitution than that provided by the federal constitution. It is well established that federal constitutional law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Moreover, we have held that in the area of fundamental civil liberties . . . our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . Recognizing that our state constitution is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution.'

(Citations omitted; internal quotation marks omitted.) *State* v. *Miller*, 227 Conn. 363, 379–80, 630 A.2d 1315 (1993)." *State* v. *Ross*, 230 Conn. 183, 247–48, 646 A.2d 1318 (1994).

When analyzing whether the state constitution affords more protection for individual rights than the federal constitution, our Supreme Court has identified six factors to be considered: "(1) the text of the constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms. *State* v. *Geisler*, [supra, 222 Conn. 684–86]." *State* v. *Ross*, supra, 230 Conn. 249.

There is no textual ban on double jeopardy in the Connecticut constitution; instead the state constitutional prohibition on double jeopardy is implied through the due process provisions of article first, §§ 8 and 9. *State* v. *Lonergan*, supra, 16 Conn. App. 363–64. It follows that there is no textual or historical reason for interpreting our own constitutional double jeopardy bar differently from the federal constitutional bar. Furthermore, when a federal double jeopardy claim is raised in the course of a single prosecution, most federal and state courts, including Connecticut courts, address the claim under the federal constitution through straightforward application of the *Blockburger* rule. See, e.g., *State* v. *McCall*, supra, 187 Conn. 89–90; *State* v. *Ortiz*, supra, 15 Conn. App. 751.

The defendant argues that two of our sister states, Louisiana and Michigan, have departed from the *Blockburger* rule in cases involving single prosecutions, and

urges us to adopt similar reasoning.[14] We decline to do so, as we do not find this precedent persuasive.

Although Louisiana has adopted the same evidence test in determining whether two crimes are the same for purposes of double jeopardy, the *Blockburger* test has not been abandoned. Instead, the Louisiana Supreme Court "has recognized two different standards" and although that court has "principally relied on the 'same evidence' test when evaluating double jeopardy claims" they have not forsworn reliance on the *Blockburger* test. *State* v. *Miller*, 571 So. 2d 603, 606 (La. 1990); see also *State* v. *Willis*, 591 So. 2d 365, 372 (La. App.), cert. denied, 594 So. 2d 1316 (La. 1992) (holding both *Blockburger* test and same evidence test compel finding that two crimes are same for double jeopardy purposes).

Michigan is the only state that has truly abandoned the *Blockburger* test for determining when punishments for violations of two different statutes imposed in a single prosecution constitute double jeopardy. In *People* v. *Robideau*, 419 Mich. 458, 355 N.W.2d 592 (1984), the Michigan Supreme Court explained that because *Blockburger* was merely a test for statutory construction, not a principle of constitutional law, it was within that court's power to abandon that test. In *Robideau*, Michigan courts were instructed to engage in a case-by-case analysis, without reference to *Blockburger*, of whether the legislature intended the statutes at issue

---

[14] We note further, that neither the Louisiana nor Michigan Supreme Court suggests that it draws any distinction between the applicable test under the double jeopardy clause of its state constitution and the applicable test under the fifth amendment to the United States constitution. Thus, the departure from the *Blockburger* rule in Louisiana and Michigan applies in the analysis of both federal and state constitutional claims. See *State* v. *Miller*, 571 So. 2d 603 (La. 1990); *People* v. *Robideau*, 419 Mich. 458, 355 N.W.2d 592 (1984).

to prohibit conduct violative of distinct social norms. Id., 484–86. The Michigan Supreme Court further held that "[w]here two statutes prohibit violations of the same social norm, albeit in a somewhat different manner, as a general principle it can be concluded that the Legislature did not intend multiple punishments." Id., 487.

Prior holdings of Connecticut courts support a finding that the implied double jeopardy clause of our own constitution is coextensive with that found in the federal constitution. "Our Supreme Court has repeatedly held that, as a general rule, 'the due process clauses of both the United States and Connecticut constitutions have the same meaning and impose similar limitations.' *State* v. *Brigandi*, 186 Conn. 521, 542, 442 A.2d 927 (1982); *Caldor's Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 314, 417 A.2d 343 (1977)." *State* v. *Leroux*, 18 Conn. App. 223, 229–30, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989). Furthermore, this court has noted that in an independent analysis of a state constitutional provision, departure from federal constitutional precedent is usually justified only "where the United States Supreme Court 'has created exception to or deviated from rules previously enunciated by it . . . .' " *State* v. *Miller*, 29 Conn. App. 207, 222–23, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993), quoting *State* v. *DeFusco*, 27 Conn. App. 248, 256, 606 A.2d 1 (1992), aff'd, 224 Conn. 627, 620 A.2d 746 (1993). When we find that our citizens have relied on an understanding of their constitutional rights that is more expansive than that afforded under a recent interpretation of the federal constitution by the United States Supreme Court, we will be inclined to interpret our state constitution as affording greater protection to preserve those rights. See, e.g., *State* v. *Oquendo*, 223 Conn. 635, 646–52, 613 A.2d

1300 (1992). Otherwise, we will continue to follow the persuasive analysis of the United States Supreme Court. *State* v. *Miller*, supra, 222–23.

The *Blockburger* rule had its genesis in *Gavieres* v. *United States*, 220 U.S. 338, 31 S. Ct. 421, 55 L. Ed. 489 (1911). Over the last fifty years, it has consistently been applied by Connecticut courts in analyzing double jeopardy claims arising from multiple convictions and punishments imposed in a single trial. See, e.g., *State* v. *McCall*, supra, 187 Conn. 89–90; *State* v. *Ortiz*, supra, 15 Conn. App. 751. Connecticut's citizens have no realistic expectation that they will have these double jeopardy claims scrutinized by a test that is more protective than the *Blockburger* test. Therefore, we decline the defendant's invitation to find that our state constitution affords any greater due process rights than those afforded under the federal constitution's double jeopardy clause.

## IV

The defendant's final contention is that the trial court improperly instructed the jury on an alternative means of committing interference with an officer that was not supported by the evidence. Again, this claim was not preserved at trial and the defendant claims review under the constitutional bypass doctrine of *Evans-Golding*. *State* v. *Golding*, supra, 213 Conn. 239–40; *State* v. *Evans*, supra, 165 Conn. 70. As the record is adequate to review the alleged claim of error, and because the claim implicates the defendant's fundamental right to be convicted only on proof beyond a reasonable doubt, we will review this claim. See *State* v. *Allen*, 216 Conn. 367, 388, 579 A.2d 1066 (1990); *State* v. *John*, 210 Conn. 652, 687, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when he

obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties." The information charged the defendant in one count with interfering with Atkins, and in a second count with interfering with Henderson and Sheffield.

The instruction given by the trial court, in connection with each count of interfering, explained: "Now, a person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer in the performance of his duties. . . . There are two essential elements of the crime of interfering with an officer—that the defendant obstructed, resisted, hindered or endangered a peace officer and that the conduct of the defendant occurred while the peace officer was in the performance of his duties.

"With respect to the first element, there are four words describing the ways interference may be committed. Obstructs means to interpose obstacles or impediments, to hinder, to impede or, in any manner, intrude or prevent. This word, in its definition, does not necessarily imply the employment of direct force or the exercise of any direct means. Resists means to oppose by direct active force or quasi-forcible means. Hinders means to make slow or difficult the progress of, it means to hold back, delay, impede or prevent action and endangers means to expose to danger or harm."

The defendant argues that because the charge to the jury assigns each word in § 53a-167a a distinct meaning, these four words necessarily represent four distinct ways that the crime of interfering with an officer can be committed. The defendant claims that because there was no evidence that he had in fact "resisted" either Atkins or Henderson and Sheffield, pursuant to the definition propounded by the trial court, he could have been improperly convicted for having committed interference by resisting.

"General Statutes § 53a-167a . . . defines 'interfering' to *include* obstruction, resistance, hindrance or endangerment." (Emphasis added.) *State* v. *Biller*, 5 Conn. App. 616, 621, 501 A.2d 1218 (1985), cert. denied, 199 Conn. 803, 506 A.2d 146, cert. denied, 478 U.S. 1005, 106 S. Ct. 3296, 92 L. Ed. 2d 711 (1986). "By using those words it is apparent that the legislature intended to prohibit *any act* which would amount to meddling in or hampering the activities of the police in the performance of their duties." (Emphasis added; internal quotation marks omitted.) *State* v. *Beckenbach*, 1 Conn. App. 669, 679, 476 A.2d 591 (1984), rev'd on other grounds, 198 Conn. 43, 501 A.2d 752 (1985). We have previously held that "[t]he purpose of the statute, which had its origin in the common law, is to enforce orderly behavior in the important mission of preserving the peace; and any act that is intended to thwart that purpose is violative of the statute." (Internal quotation marks omitted.) Id. Today, we further clarify the interpretation of § 53a-167a by explicitly holding that the four means of interfering listed in that statute are not conceptually distinct, and do not constitute disjunctive methods by which interfering with an officer can be committed.

This analysis of § 53a-167a is supported by our Supreme Court's holding in *State* v. *Smith*, 212 Conn. 593, 563 A.2d 671 (1989). In *Smith*, our Supreme Court rejected an argument that the statutory alternatives listed in § 53a-8[15] were each distinct methods of being an accessory to a crime. The trial court in *Smith* had instructed that the defendant could be convicted as an accessory if he " 'solicited or requested or commanded

---

[15] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

or importuned or intentionally aided another person in the commission of a murder.' " Id., 602. The trial court went on to define these terms as follows: "[solicit means] to ask earnestly; [request means] to ask for or express a desire for; [command means] to order or direct; [importune means] to command, urge, or incite; and [aid means] to assist, help or support." (Internal quotation marks omitted.) Id., 606. Our Supreme Court explained that "[i]t is clear from these definitions that the alternative bases of liability under § 53a-8 are practically indistinguishable. They represent slightly different characterizations that can be given the defendant's particular conduct, all of which make a defendant an accessory to a crime." Id., 606–607.

Although the issue in *Smith* was whether an instruction should be given requiring the jury to decide unanimously under which alternative the defendant was liable should be given, the analysis is equally applicable in determining whether the statutory alternatives are a disjunctive means of committing a crime or merely descriptive of possible ways that a single crime might be committed. In this case, the definitions in the trial court's charge to the jury demonstrate that "obstructs," "hinders," "resists" and "endangers" are nothing more than slightly different characterizations of "interference." We hold that these slightly different characterizations do not rise to the level of being conceptually distinct bases of liability under § 53a-167a. The defendant's claim that the trial court improperly instructed on a statutory alternative that was not supported by the evidence is, therefore, without merit.

The judgment is affirmed.

In this opinion HEIMAN, J., concurred.

HENNESSY, J., dissenting. I concur with parts III and IV of the majority opinion. I write separately because

I disagree with part I A, where the majority holds that there was sufficient evidence for the jury to convict the defendant of escape from custody in violation of General Statutes § 53a-171.[1]

The majority holds that "custody" as defined in General Statutes § 53a-168 (2), which is a prerequisite to escape from custody as defined by § 53a-171, is accomplished by a police officer's pointing a gun at a suspect and telling the suspect that he is under arrest. The majority reaches its holding by explaining that "[t]he defendant should reasonably have understood that he was not free to leave because he was under arrest when Atkins, a policeman in uniform, pointed his service revolver at him and said 'freeze' and 'you are under arrest.' " I do not agree.

It is settled law that if a reasonable person would not feel free to leave, the suspect is "in custody" so as to trigger the right to receive *Miranda*[2] warnings prior to police interrogation. See *State* v. *Rasmussen*, 225 Conn. 55, 76, 621 A.2d 728 (1993); *State* v. *Pittman*, 209 Conn. 596, 608, 553 A.2d 155 (1989).[3] An arrest is not necessary for a person to be "in custody" for purposes of custodial interrogation. *State* v. *Rasmussen*, supra, 76; *State* v. *Pittman*, supra, 608. I disagree with the majority's incorporation of the custodial interrogation language in the definition of "custody" for purposes of escape from custody for the following reasons.

---

[1] I offer no opinion on parts I B, I C and II because my dissent from part I A makes it unnecessary to address those issues.

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] This language is also used to define when a "seizure" has taken place for purposes of article first, § 7, of the Connecticut constitution. See *State* v. *Oquendo,* 223 Conn. 635, 653, 613 A.2d 1300 (1992) ("seizure" has taken place for purposes of article first, § 7, whenever "a reasonable person would have believed he was not free to leave").

First, "custody" in the context of escape is qualitatively different from "custody" in the context of police interrogation. The judicial implementation of an expansive concept of what it means to be "in custody" for purposes of custodial interrogation reflects the importance of the constitutional right not to incriminate oneself through coerced statements. See *State* v. *Hoeplinger*, 206 Conn. 278, 286, 537 A.2d 1010 (1988). In contrast, defining custody for purposes of escape from custody requires the interpretation of a penal statute that should be strictly construed in favor of the accused. *State* v. *Breton*, 212 Conn. 258, 268–69, 562 A.2d 1060 (1989).

Second, the legislative definition of "custody" in § 53a-168 makes it clear that an arrest is always prerequisite to the crime of escape from custody as defined in § 53a-171. " 'Custody' means restraint by a public servant *pursuant to an arrest* . . . ." (Emphasis added.) General Statutes § 53a-168 (2). To hold that custody as defined by § 53a-168 can occur without an arrest contradicts the plain language of the statute. See *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 341, 612 A.2d 1203 (1992); *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 193, 530 A.2d 171 (1987); *Toll Gate Farms, Inc.* v. *Milk Regulation Board,* 148 Conn. 341, 347, 170 A.2d 883 (1961). Thus, for purposes of escape from custody, I do not agree with the majority's use of the standard that custody exists whenever a reasonable person would not feel free to leave.

The testimony of Atkins at trial was that when he arrived on the third floor porch at 46-50 Wordin Avenue, the defendant had both legs over the porch railing. Atkins then told the defendant he was under arrest and reholstered his weapon. At this point, Atkins attempted to grab the defendant, but he succeeded in grabbing only the hood of the defendant's sweatshirt. The defendant then jumped from the third floor porch,

causing the hood to rip off of his sweatshirt, and he successfully evaded the police. From these facts, it is clear that Atkins attempted to arrest the defendant, but that the arrest was never completed. Therefore, escape from custody could not occur.

When the plain language of a statute is unambiguous, we do not look further in ascertaining its meaning. *University of Connecticut* v. *Freedom of Information Commission*, 217 Conn. 322, 328, 585 A.2d 690 (1991). To the extent that the language of §§ 53a-168 and 53a-171 can be viewed as ambiguous, it is appropriate to look at the history of these statutes to determine their meaning. *Nationwide Mutual Ins. Co.* v. *Pasion*, 219 Conn. 764, 768, 594 A.2d 468 (1991). These statutes were adopted in their present form as part of the revision of the Connecticut penal code in 1969. There was no discussion in the legislature as to the enactment of the escape statutes, even though this was the first time flight from arrest had been criminalized as escape from custody.[4] In drafting the Connecticut penal code, however, our legislature " 'relied heavily upon the Model Penal Code and various state criminal codes, especially the penal code of New York. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 11.' *State* v. *Hill*, 201 Conn. 505, 517, 523 A.2d 1252 (1986). Thus, [in the absence of legislative history] we may turn to the parallel statutory provisions set forth in the Model Penal Code and the New York Revised Penal Law, effective September 1, 1967, for guidance. *State* v. *Hill*, supra, 516–17; *In re Juvenile Appeal (Docket No. 9268)*, 184 Conn. 157, 163–64 nn. 8–9, 439 A.2d 958 (1981)." *State* v. *Havican*, 213 Conn. 593, 601, 569 A.2d 1089 (1990).[5]

---

[4] Prior to the 1969 adoption of the penal code, crimes of escape encompassed only escape from a prison or jail, and escape while being transported to or from a prison or jail. See General Statutes (1953 Rev.) § 53-155 et seq.

[5] Our Supreme Court has previously turned to the criminal code of New York for guidance in defining "escape" as it is used in our General Statutes. *State* v. *Lubus*, 216 Conn. 402, 408, 581 A.2d 1045 (1990).

New York's escape statutes parallel the law in Connecticut by providing that "[a] person is guilty of escape . . . when he escapes from custody" and that " '[c]ustody' means restraint by a public servant pursuant to an authorized arrest . . . ." N.Y. Penal Law §§ 205.00 and 205.05 (McKinney 1984). Applying this statutory scheme, the Fourth Appellate Division of the New York Supreme Court held that when a police officer approached the defendant and told him he was under arrest, and the police officer grabbed at the defendant, but the defendant avoided the officer's grasp and fled from the area, no escape had taken place. *People* v. *Caffey*, 134 App. Div. 2d 923, 521 N.Y.S.2d 937, cert. denied, 70 N.Y.2d 930, 524 N.Y.S.2d 681 (1987).[6] The *Caffey* court held that "escape involves conduct occurring *after* a person has been arrested" and is to be distinguished from "the crime of resisting arrest [which] involves conduct occurring *at the time of* the arrest itself." (Emphasis added.) Id., citing *People* v. *Becoats*, 88 App. Div. 2d 766, 451 N.Y.S.2d 497 (1982). In *Caffey*, as in the present case, "[d]efendant's conduct in avoiding the officer's grasp occurred at the time of arrest and defendant was not sufficiently restrained to have been in custody." *People* v. *Caffey*, supra, 923.

I believe, in this case, that without restraint of the defendant by Atkins, there was no arrest, and no custody for the purpose of the escape from custody statute.[7] As the defendant's flight was from an attempted

---

[6] Several of our other sister states have also held that words of arrest uttered by a peace officer are insufficient to effect an arrest or to impose custody for purposes of escape from custody. See *Ex Parte McReynolds*, 662 So. 2d 886, 888 (Ala. 1994); *People* v. *Kosyla*, 143 Ill. App. 3d 937, 951, 494 N.E.2d 945 (1986); *State* v. *Daley*, 411 A.2d 410, 412 (Me. 1980).

[7] I would not hold that actual restraint is the only means of effecting an arrest. I am inclined to favor the law of several of our sister states that an arrest occurs when the suspect is restrained *or* submits to the author-

arrest and not from "restraint pursuant to arrest," it cannot result in a lawful conviction under § 53a-171.[8] For this reason, I would remand the case to the trial court with direction to vacate the defendant's conviction of escape from custody.

Accordingly, I respectfully dissent.

ity of the person making the arrest. See *State* v. *Sanchez*, 145 Ariz. 313, 315, 701 P.2d 571 (1985), citing Ariz. Rev. Stat. § 13-3881; *People* v. *Kosyla*, 143 Ill. App. 3d 937, 494 N.E.2d 945 (1986), citing Ill. Rev. Stat., c. 38, par. 107-5 (a) (1983); *State* v. *Logan*, 8 Kan. App. 2d 232, 233, 654 P.2d 492 (1982), citing Kan. Stat. Ann. § 22-2405 (1); *State* v. *Daley*, 411 A.2d 410, 412 (Me. 1980), citing *State* v. *Powers*, 386 A.2d 721, 727 (Me. 1978); *State* v. *Nicholson*, 839 S.W.2d 593, 597 (Mo. App. 1992), citing *California* v. *Hodari D.*, 499 U.S. 621, 627–28, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991); *People* v. *Caffey*, supra, 134 App. Div. 2d 923. In this case the defendant's refusal to submit to Atkins' authority is evidenced by his remaining poised, with his legs over the porch railing, and ultimately jumping from the porch, despite Atkins' words of arrest.

[8] I advance no opinion as to whether the defendant's conduct in this case would have provided a sufficient basis for a conviction of resisting an officer pursuant to General Statutes § 53a-167a.