******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL A.
URBANOWSKI
(AC 36771)

Keller, Prescott and Mullins, Js.

*Argued October 23, 2015—officially released March 1, 2016*

(Appeal from Superior Court, judicial district of

Tolland, Bright, J.)

*Arthur L. Ledford*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Nicole I. Christie*, assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Michael Urbanowski, appeals from the judgment of conviction, rendered following a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (1), breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (2), strangulation in the second degree in violation of General Statutes § 53a-64bb (a), and threatening in the second degree in violation of General Statutes § 53a-62 (a) (1). Additionally, following the defendant's plea of nolo contendere, the defendant was convicted of being a persistent serious felony offender in violation of General Statutes § 53a-40 (c) and (j), as alleged in a part B information.[1] The defendant claims that the trial court improperly (1) rendered a judgment of conviction that encompassed both assault in the second degree and strangulation in the second degree or, in the alternative, punished him for both of these offenses in violation of the constitutional prohibition against double jeopardy, and (2) admitted evidence of his prior uncharged misconduct. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The victim, Patricia Staveski, became acquainted with the defendant because he was a patron of a bar at which she worked. The victim learned that the defendant was willing to help others by performing maintenance work on their automobiles free of charge. In early May, 2012, the defendant, using parts that the victim had purchased, fixed the brakes in the victim's automobile free of charge.

On May 11, 2012, the defendant agreed to replace the water pump on the victim's automobile. The victim understood that this would be done without charge, simply as "a nice deed" by the defendant. Late in the day, after the defendant had completed work for his employer, the defendant repaired the victim's automobile in the driveway of a residence, where the defendant was renting a room. The victim sat in her automobile while the defendant performed the repair, which took several hours. While performing the repair, the defendant consumed beer.

By the time that the defendant finished working on the victim's automobile, it was dark outside. The victim stated that she was tired and that she intended to leave. The defendant "copped an attitude" when the victim made these statements, stating, "you're going to leave after I just helped you out?" Reluctantly, the victim accompanied the defendant inside of the residence. Inside, the defendant played some music, the victim consumed a drink, and the defendant and the victim talked for a brief period of time. The defendant invited the victim to join him in lying down on a couch. The

victim declined the invitation and stated that she was leaving. The victim understood the defendant's invitation to lie on the couch to suggest that he wanted to have sexual relations with her. The victim, who had known the defendant for several weeks, did not want an intimate relationship with the defendant, and did not consider him to be a friend or a boyfriend.

The victim's stated intention to leave caused the defendant to become very angry. The defendant began yelling that the victim was not going to leave. For a brief period of time, the defendant went into a bathroom, at which time the victim used her cell phone to call her son, Jordan Bechard, for assistance. The victim told Bechard that she was in trouble and provided him with the defendant's address. When the defendant came out of the bathroom, he grabbed the cell phone from the victim and destroyed it. Before the call ended abruptly, Bechard heard the defendant yell at the victim to "get the F off" of the cell phone.

The defendant threw the victim across the room, causing her head to strike a wall in a kitchen. The defendant threw the victim a second time in an area near the kitchen that had a small porch, causing further injury to her head. There, the defendant repeatedly punched the victim in her face for a lengthy period of time.

The defendant ordered the victim to get up but, by this point in time, she physically was unable to do so. Then, the defendant grabbed the victim by her feet and dragged her down the driveway in the direction of her automobile. The defendant, who was wearing work boots, intermittently punched and kicked the victim in the face and head. A neighbor, Leanne Litz, overheard the defendant yelling, "I'm going to fucking kill you," while the victim repeatedly screamed for help. The neighbor called 911.

Ultimately, the defendant positioned the victim on a seat in her automobile. He put his weight on her with his knee and repeatedly strangled her by wrapping his hands around her neck and pushing. He punched her in the face with both fists. He stated: "[Y]ou die, bitch. Say goodbye to your kids." Inside the automobile, the victim lost and regained consciousness several times. Several times when she regained consciousness and began to open her eyes, the defendant expressed his anger and assaulted her yet again. At one point, he stated, "[w]hy won't you die, you dumb bitch?"

After a lengthy assault in the automobile, the defendant walked to a nearby garage on the property. The victim opened a door, fell out of the automobile, and crawled to a neighbor's house that was located across the street, where she summoned help. The neighbor, Andrew Scott, permitted the victim to take refuge inside of his residence, provided assistance to the victim, and

called 911. Bechard, who was in Springfield, Massachusetts, when his mother, the victim, called him earlier that evening, arrived at the defendant's residence. Initially, he could not find the victim at the residence, but observed massive amounts of blood in his mother's automobile, which remained in the driveway. The victim used Scott's telephone to call Bechard and inform him of her whereabouts. Later, Bechard accompanied her to a hospital.

After the victim had fled from her automobile, the defendant drove away from the scene in his automobile. He drove to the home of one of his relatives, where, shortly after his assault of the victim, police found him asleep in the backseat of his automobile. The defendant told police that he had been involved in an altercation with his girlfriend, and police observed that the defendant's knuckles were swollen and that he had dried blood on his hands, clothing, and face. The police officers placed the defendant under arrest.

Emergency medical personnel provided life sustaining treatment to the victim before they transported her to a hospital. The defendant's assault caused the victim to suffer many serious injuries with long-lasting negative effects that interfered with her ability to engage in the normal activities of life. Among other injuries, the victim suffered a concussion, lacerations and hematomas about her head and face, as well as bruising, especially around her throat and neck. She sustained a "golf ball sized depression" on the top of her head. The assault caused the victim a great deal of pain and, at times, left her unable to see. Immediately following the assault, the victim exhibited confusion, lethargy, and decreased cognitive function. For many weeks following the assault, the victim experienced pain, headaches, dizziness, bruising, vertigo, cognitive impairment, vision problems, and problems with balance. Additionally, the defendant's actions affected the sound of the victim's voice.

The defendant's case was tried before a jury in December, 2013. This appeal followed the defendant's conviction of assault in the second degree, breach of the peace in the second degree, strangulation in the second degree, and threatening in the second degree. Additional facts will be set forth as necessary.

I

First, the defendant claims that the court improperly rendered a judgment of conviction that encompassed both assault in the second degree and strangulation in the second degree. The defendant argues that his conviction of both assault and strangulation violated § 53a-64bb (b). Alternatively, the defendant argues that his conviction of both charges ultimately violated the prohibition against double jeopardy under the state and federal constitutions because, under the test set forth

in *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932), as a result of a single act or transaction, he received multiple punishments resulting from his conviction of two offenses that required proof of substantively identical elements.[2]

The defendant correctly acknowledges before this court that he failed to raise the present claim, in any form, before the trial court. On multiple grounds, however, the defendant argues that the claim is reviewable on appeal.

Initially, the defendant argues that his claims "[are] properly preserved in that [he] may challenge the legality of a sentence at any time, and the court has the authority to correct an illegal sentence." This, however, is not an appeal from the denial of a motion to correct an illegal sentence. Although we recognize that the defendant's claim involves issues that properly may have been raised before the trial court in a motion to correct an illegal sentence,[3] we also recognize that, in recent decisions, this court has determined that it is inappropriate to review an illegal sentence claim that is raised for the first time on appeal. "Our rules of practice confer the authority to correct an illegal sentence on the trial court, and that court is in a superior position to fashion an appropriate remedy for an illegal sentence. . . . Furthermore, the defendant has the right, at any time, to file a motion to correct an illegal sentence and raise [an illegal sentence] claim before the trial court." (Citation omitted.) *State* v. *Starks*, 121 Conn. App. 581, 592, 997 A.2d 546 (2010) (declining to review unpreserved claim of illegal sentence under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 [1989], or plain error doctrine embodied in Practice Book § 60-5); see also *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 38 n.13, 779 A.2d 80 (2001) (clarifying that "judicial authority" in context of Practice Book § 43-22 refers exclusively to trial court); *State* v. *Crump*, 145 Conn. App. 749, 766, 75 A.3d 758 ("[i]t is not appropriate to review an unpreserved claim of an illegal sentence for the first time on appeal" [internal quotation marks omitted]), cert. denied, 310 Conn. 947, 80 A.3d 906 (2013); *State* v. *Brown*, 133 Conn. App. 140, 145–46 n.6, 34 A.3d 1007 (2012) (same), rev'd on other grounds, 310 Conn. 693, 80 A.3d 878 (2013).

Apart from inviting this court to correct an illegal sentence, the defendant argues that the claim is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40, or the plain error doctrine. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if

subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) Id.; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third prong).

Insofar as the defendant's claim is based on a violation of § 53a-64bb (b),[4] the claim is not reviewable under *Golding* because it alleges only a violation of statutory magnitude. See *State* v. *Graham S.*, 149 Conn. App. 334, 343, 87 A.3d 1182 (claim brought under § 53a-64bb [b] is statutory in nature), cert. denied, 312 Conn. 912, 93 A.3d 595 (2014). Insofar as the defendant's claim is based on a violation of the prohibition against double jeopardy afforded under the state and federal constitutions, however, the claim is reviewable under *Golding* because the record is adequate for review, and the claim is of constitutional magnitude. See, e.g., *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 261, 61 A.3d 1084 (2013); *State* v. *Kurzatowski*, 119 Conn. App. 556, 568, 988 A.2d 393, cert. denied, 296 Conn. 902, 991 A.2d 1104 (2010). The defendant claims that he received multiple punishments for the same offense in a single trial. "A defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . . Because the claim presents an issue of law, our review is plenary." (Citations omitted.) *State* v. *Crudup*, 81 Conn. App. 248, 252, 838 A.2d 1053, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

Thus, we turn to an evaluation of the defendant's claim to determine whether a double jeopardy violation exists and deprived him of a fair trial.[5] "A defendant's double jeopardy challenge presents a question of law over which we have plenary review. . . . The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial. . . .

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . .

"Traditionally we have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial. . . .

"Our analysis of [the defendant's] double jeopardy [claim] does not end, however, with a comparison of the offenses. The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent. . . . Thus, the *Blockburger* test creates only a rebuttable presumption of legislative intent, [and] the test is not controlling when a contrary intent is manifest. . . . When the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary." (Citations omitted; internal quotation marks omitted.) *State* v. *Wright*, 319 Conn. 684, 689–90,     A.3d     (2015).

The state argues, and we agree, that the defendant's claim fails because he has failed to prove that the assault and the strangulation charges arose from the same act or transaction. Thus, we may resolve the claim without engaging in the technical exercise of examining the statutes and charging documents to determine whether each provision of two distinct statutes require proof of a fact that the other does not or in a statutory analysis of legislative purpose under *Blockburger*.[6] See *State* v. *Marsala*, 1 Conn. App. 647, 650, 474 A.2d 488 (1984) (once court concludes that offenses at issue did not arise out of same act or transaction, it need not consider distinction between them). "On appeal, the defendant bears the burden of proving that the prosecutions are for the same offense in law and fact." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 361, 796 A.2d 1118 (2002); see also *State* v. *Brown*, 299 Conn. 640, 654, 11 A.3d 663 (2011) (same).

"Although [d]ouble jeopardy prohibits multiple punishments for the same offense in the context of a single trial . . . distinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense.

. . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 299 Conn. 652; see also *State* v. *Miranda*, 260 Conn. 93, 122–23, 794 A.2d 506 (in determining whether two convictions arose from same act or transaction, reviewing court looks to evidence presented at trial), cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); *State* v. *Thompson*, 197 Conn. 67, 71–72, 495 A.2d 1054 (1985) (same). "If a violation of law is not continuous in its nature, separate indictments may be maintained for each violation. Thus, a distinct repetition of a prohibited act constitutes a second offense and subjects the offender to an additional penalty." (Internal quotation marks omitted.) *State* v. *Snook*, 210 Conn. 244, 261, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989).

Initially, we observe that the present claim does not involve distinct repetitions of the same prohibited act, but the commission of distinct offenses, each of which required proof of an intent to cause a different result. With respect to the offense of assault in the second degree, the state bore the burden of proving beyond a reasonable doubt that the defendant intended to cause serious physical injury to the victim. General Statutes § 53a-60 (a) (1).[7] With respect to the offense of strangulation in the second degree, the state bore the burden of proving beyond a reasonable doubt that the defendant intended to impede the victim's ability breathe or intended to restrict her blood circulation. General Statutes § 53a-64bb (a).[8]

Previously, we set forth the facts that reasonably could have been found by the jury. The state presented evidence that the defendant threw the victim across a room in his residence, causing her to strike her head on a wall in the kitchen. Next, the defendant threw the victim into a porch area near the kitchen of the residence, causing further injury to her head. While the victim was still on the porch, the defendant repeatedly punched her in the face. Next, the defendant dragged the victim by her feet outdoors, down the driveway, at which time he punched and kicked the victim about the face and head. Finally, the defendant positioned the victim inside of her automobile, where he held her down and repeatedly strangled her by wrapping his hands around her neck and pushing.

At trial, the prosecutor argued that it was reasonable for the jury to find the defendant guilty of both assault and strangulation. Cf. *State* v. *King*, 149 Conn. App. 361, 371, 87 A.3d 1193 (state precluded from arguing on appeal that there were two separate crimes because it did not so argue at trial), cert. granted on other

grounds, 312 Conn. 917, 94 A.3d 642 (2014). In argument before the jury, the prosecutor distinguished between the evidence related to each of the offenses at issue. With regard to the assault charge, the prosecutor drew the jury's attention to the defendant's initial conduct that occurred inside of the victim's residence, when the defendant caused the victim to strike her head. Next, the prosecutor drew the jury's attention to the evidence that the defendant repeatedly punched and kicked the victim in the driveway. Also, the prosecutor drew the jury's attention to the fact that, during these events, she was struck many times about her face and head, which caused her to sustain black eyes and a traumatic brain injury.

With regard to the strangulation charge, the prosecutor drew the jury's attention to the defendant's conduct that occurred inside of the automobile, in which he held her down and wrapped his hands around her neck, thereby restricting her airway or blood flow. Also, the prosecutor referred to the fact that, during these acts that took place inside of the automobile, the defendant made statements in which he expressed a desire to kill the victim.

Although the state charged the defendant with multiple offenses that occurred at the same residence at approximately the same time, the evidence and the state's theory of the case reflects that each offense was proven by a separately completed act committed with the requisite criminal intent. The state's theory of the case, supported by the evidence, was that the defendant, intending to cause serious physical injury, engaged in assaultive behavior toward the victim inside of the residence and when he dragged the victim down the driveway. Among other things, this behavior caused a brain injury. In contrast, later, while inside of the automobile, the defendant, intending to impede the victim's ability to breathe or to restrict her blood circulation, wrapped his hands around the victim's neck, causing her to be unable to breathe. Thus, the state demonstrated that the defendant had committed distinct types of violent acts at distinct locations at his residence. Moreover, the state demonstrated that these violent acts resulted in distinct results. Inside of the residence and while she was being dragged down the driveway, the victim sustained serious physical injuries. Inside of the automobile, the victim experienced an inability to breathe.

The defendant suggests that his conduct in assaulting the victim inside of the residence and while he dragged her down the driveway merely was incidental to his commission of the crime of strangulation. He argues that it was reasonable for the jury to infer that his conduct prior to that which occurred in the automobile was necessary for him to gain physical control over the victim so that he could "overpower her and strangle

her." It is apparent, however, that the defendant's conduct toward the victim inside of the residence and in the driveway—which occurred before he positioned her inside of the automobile and strangled her—established his guilt for assault in the second degree on a basis separate from his later act of strangulation inside of the automobile. It is unreasonable to suggest that the defendant had engaged in conduct that constituted one continuous offense, strangulation in the second degree, when he assaulted the victim inside of the residence and in the driveway. The evidence demonstrated that he did not engage in conduct that constituted strangulation in the second degree until after he had positioned the victim inside of her automobile, held her down, and wrapped his hands around her neck. See *State* v. *Miranda*, 142 Conn. App. 657, 664–65, 64 A.3d 1268 (2013) (holding in analysis under § 53a-64bb that defendant's conduct toward victim in bathroom established guilt of unlawful restraint in first degree on basis of conduct separate from his later act of strangulation that occurred in kitchen), appeal dismissed, 315 Conn. 540, 109 A.3d 452 (2015).

It is not dispositive in a double jeopardy analysis that multiple offenses were committed in a short time span and during a course of conduct that victimized a single person. Instead, the relevant inquiry focuses on whether each offense of which the defendant has been convicted and punished properly is based upon distinct criminal acts or transactions that occurred within that course of conduct. See, e.g., *State* v. *James E.*, 154 Conn. App. 795, 833–34, 112 A.3d 791 (2015) (holding on double jeopardy grounds that defendant's conduct in shooting victim twice supported conviction of two assault charges); *State* v. *Beaulieu*, 118 Conn. App. 1, 14, 982 A.2d 245 (holding on double jeopardy grounds that defendant's act of luring minor victim into situation for purpose of engaging in sexual act with minor victim was separate and distinct act from his immediately subsequent conduct engaging in sexual act with that victim), cert. denied, 294 Conn. 921, 984 A.2d 68 (2009); *State* v. *Servello*, 80 Conn. App. 313, 324–26, 835 A.2d 102 (2003) (holding on double jeopardy grounds that defendant was properly convicted of multiple counts of perjury arising from testimony regarding same general subject matter at single hearing), cert. denied, 267 Conn. 914, 841 A.2d 220 (2004).

Because the defendant is unable to prove that his separate punishments for assault in the second degree and strangulation in the second degree arose out of the same act or transaction, he is unable to demonstrate that a constitutional violation exists and deprived him of a fair trial. Accordingly, this claim fails.[9]

## II

Next, the defendant claims that the court improperly admitted evidence of his prior uncharged misconduct.

We agree with the defendant that the admission of the evidence was improper, but conclude that the error was harmless.

The facts underlying this claim are as follows. Prior to trial, the state provided written notice to the defendant and to the court that it sought to introduce evidence of uncharged misconduct involving the defendant and three women who were not otherwise connected to the present case, namely, Suzanne Schulman, Joanne Shustock, and Julie Bradley. The state provided the court with information about the misconduct at issue involving each potential witness. The court precluded the state from presenting evidence concerning prior misconduct that involved Bradley and Shustock, and those rulings are not at issue in the present claim.

With respect to uncharged misconduct evidence concerning Schulman, prior to her testifying before the jury, the prosecutor proffered that Schulman would testify that, in or before October, 2002, she was in an intimate relationship with the defendant, that he was residing at her home, and that she wanted to end the relationship. Schulman was lying in a bed with the defendant when the defendant "got on top of her" and "wanted to start something sexually." Schulman refused the defendant's advances and told him that she wanted him to leave. At this point, the defendant choked Schulman. Schulman convinced the defendant to walk with her to a nearby gas station, where she reported the incident to a third party. The defendant then took her to the back of the building and choked her again. Schulman did not report this incident to the police.

Additionally, the prosecutor represented that in October, 2002, there was a second violent incident involving the defendant that led Schulman to call the police. The defendant was in Schulman's residence, and she asked him to leave. Although he did so, he wanted to reenter Schulman's residence, but Schulman would not let him do so. Thereafter, the defendant forcibly entered the home and "lunged at her throat area." The police report concerning this incident, which the state provided to the court, indicated that Schulman had sustained minor physical injuries in connection with this incident.

Essentially, the prosecutor argued that the prior misconduct evidence was admissible to demonstrate the defendant's intent and motive in the present case. The prosecutor argued that the evidence would establish that the defendant used force and choked the victim when she refused his sexual advances, and that Schulman's representations demonstrated that the defendant behaved in a similar manner when she had refused his sexual advances. The prosecutor argued that Schulman's testimony was relevant to demonstrate that because of his prior violent interactions with Schulman, the defendant had understood the nature of his violent actions toward the victim and, thus, had intended to

harm her. Also, the prosecutor argued that Schulman's testimony was relevant to demonstrating that he was motivated by a desire to gain control of the victim when she had refused his sexual advances.

Initially, the court was not inclined to admit the evidence concerning Schulman, in part because it believed that the state had the ability to and intended to present more persuasive prior uncharged misconduct evidence concerning Shustock. The court, however, stated that it would reconsider the issue as necessary. Later, in light of new information related to the incident involving Shustock, the court reevaluated the probative value of the evidence concerning Shustock, and inquired if the state wanted to present testimony from Schulman instead. The court ruled that it would permit Schulman to testify "as to motive and intent" solely with regard to the choking incident, but not about the second incident involving the defendant that she had reported to the police. The court stated that the evidence was relevant to the issues of motive and intent to strangle the victim.

The defendant's attorney objected to the court's ruling. The defendant's attorney argued that he was unaware of any authority that supported the admission of uncharged misconduct evidence, particularly in light of the fact that the case did not involve charges of a sexual nature and it was not a case in which the identity of the alleged perpetrator was at issue. The defendant's attorney argued that the defendant did not contest that he was involved in an altercation with the victim and that the state had an ample opportunity to prove its case without the admission of the evidence at issue. The defendant's attorney argued that the evidence was highly prejudicial and was being introduced by the state to "put a bad light" on the defendant.

The court overruled the defendant's objection. First, the court observed that uncharged misconduct evidence had been admitted as evidence of intent and motive in prior cases that had involved crimes of a nonsexual nature. Specifically, the court referred to *State* v. *Aparo*, 223 Conn. 384, 614 A.2d 401 (1992), cert. denied, 507 U.S. 972, 113 S. Ct. 1414, 122 L. Ed. 2d 785 (1993), and *State* v. *Hoyeson*, 154 Conn. 302, 224 A.2d 735 (1966). Second, with regard to the issue of undue prejudice, the court stated that it needed to undertake a balancing test to evaluate whether the evidence, which demonstrated that the defendant knew "from past experience whether his actions would cause . . . certain effects, which shows an absence of mistake and knowledge . . . and an intent to do that" should be excluded because its prejudicial effect outweighed such probative value. The court stated that the evidence was probative to the jury's understanding of why the defendant might have behaved in the manner alleged by the state in the present case. The court stated that it was "a close call," but that it believed that the repeated use of limiting

instructions could militate against undue prejudice. The defendant's attorney expressed his concern that the jury might not follow the court's limiting instructions, instead viewing Schulman's testimony as proof that the defendant has a propensity to engage in the type of conduct at issue.

Immediately before the state presented testimony from Schulman, the court delivered an instruction to the jury in which it limited its consideration of the evidence to the issues of intent and motive.[10] Schulman testified that, in October, 2002, the defendant stayed at her home for a period of time. She described an incident that occurred when she and the defendant were lying on a bed and arguing. Schulman testified that, during the incident, the defendant was sitting on top of her and holding her down, and he said, "you're going to die," and, "[s]ay goodbye." The defendant positioned his hands around her neck and choked her, causing her to be unable to breathe. Schulman testified that she believed that she would pass out, and stared right at the defendant, at which time he let go of her neck. Schulman testified that the defendant told her that he let go of her neck because he believed that she was turning blue. Schulman stated, "[m]aybe he thought he was going too far, and he let go."

The prosecutor asked Schulman: "Before he got on top of you, did he ask of you anything? Did he want anything from you?" Schulman replied, "I don't recall. I don't remember." Schulman testified that she and the defendant had been intimate on five occasions prior to this incident, but she did not recall whether the defendant wanted to be intimate with her that night.

Schulman went on to testify that, after the choking incident inside of her apartment, she suggested to the defendant that they walk to a nearby gas station to purchase cigarettes. She and the defendant walked to the gas station, where she began screaming for help and for someone to call the police because the defendant was going to kill her. Schulman testified that nobody helped her and that, when she and the defendant went outside, the defendant "took [her] by [her] neck and dragged [her] behind the building" where he choked her a second time. Schulman testified that it was difficult for her to breathe while the defendant choked her, and that she was able to push the defendant off of her. Afterward, Schulman and the defendant returned to the apartment.

Immediately after Schulman testified, the court delivered a revised limiting instruction in which it instructed the jury to consider the testimony solely for the issue of intent.[11] Notably, the court emphasized that because Schulman could not recall what led to the choking incident, her testimony was not relevant to the issue of motive. Outside of the presence of the jury, the defendant's attorney moved to strike Schulman's testimony

on the ground that her testimony was unduly prejudicial in light of the fact that it concerned an incident that occurred in October, 2002, more than ten years earlier.[12] The defendant's attorney reiterated his earlier argument that the testimony was unduly prejudicial. The prosecutor responded that she was not sure why Schulman did not testify that the choking incident occurred immediately after she had rebuffed the defendant's sexual advances, as she had related to her.

Overruling the defendant's motion to strike, the court stated that it had provided the jury with a detailed and lengthy curative instruction, and had later modified that instruction to emphasize that the witness had been unable to recall what led to the choking incident and, therefore, her testimony was irrelevant to the issue of motive in the present case. The court stated that in ruling on the admissibility of the evidence, it had considered the fact that the incident involving Schulman occurred in 2002 and that the events at issue in this case occurred in 2012. Then, the court stated: "However, given the purpose for which it was offered, which is to show that at the time of the allegations here . . . the defendant intended or understood and intended that his action could impede another person's breathing and restrict their blood circulation, the fact that this happened ten years ago is not too remote in time for that particular purpose." Also, the court stated that any prejudice was limited by its curative instructions and the brevity of Schulman's testimony.[13]

By virtue of his objections before the trial court, the defendant preserved the present claim of evidentiary error for appellate review. Before this court, the defendant correctly acknowledges that the trial court instructed the jury that the evidence was relevant in the context of the strangulation charge to prove that the defendant intended to impede the victim's ability to breathe and to restrict her blood flow. See footnotes 6 and 7 of this opinion. The defendant argues, however, that the evidence, which was highly prejudicial, had no probative value in this regard because, at most, the evidence merely demonstrated that the defendant knew he could strangle someone with his hands, a type of knowledge that was not at all unique. The defendant argues that, because the present case did not involve a sex crime, the court failed to apply a more stringent standard when balancing the relevance of the evidence and its prejudicial effect.

The admission of uncharged misconduct evidence is governed by § 4-5 of the Connecticut Code of Evidence, which provides: "(a) Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant

had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect.

"(c) Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct." Conn. Code Evid. § 4-5.

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Kalil*, 314 Conn. 529, 540, 107 A.3d 343 (2014).

In ruling on the admissibility of uncharged misconduct evidence in a criminal case, a court must consider the purpose for which the evidence is offered as well as the type of crime with which the defendant stands charged. In cases involving aberrant and compulsive sexual misconduct, uncharged misconduct evidence may be admissible to demonstrate a defendant's propensity to engage in certain types of sexual behavior. Conn. Code Evid. § 4-5 (b); *State* v. *DeJesus*, 288 Conn. 418, 470–71, 953 A.2d 45 (2008). "In non-sexual assault cases, evidence of uncharged misconduct may still be admissible . . . if it is so connected with the charged misconduct to be relevant to (1) intent, (2) identity, (3) malice, (4) motive, (5) common plan or scheme, (6) absence of mistake or accident, (7) knowledge, (8) a system of criminal activity, (9) an element of the crime, or (10) corroboration of crucial prosecution testimony."

C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 4.19.2, pp. 181–82.

Uncharged misconduct evidence that falls within an exception to the general rule precluding its admission is, by its nature, almost always prejudicial to some degree. In its gatekeeping role, the court must consider whether the probative value of this evidence, like all evidence, is outweighed by its likely prejudicial effect. See Conn. Code Evid. §§ 4-1 and 4-3. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jur[ors]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value." (Internal quotation marks omitted.) *State* v. *Dillard*, 132 Conn. App. 414, 425–26, 31 A.3d 880 (2011), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012). Our Supreme Court "has identified four factors relevant to determining whether the admission of otherwise probative evidence is unduly prejudicial. These are: (1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013).

In the present case, the court admitted uncharged misconduct evidence, in the form of Schulman's testimony, for the limited purpose of evaluating whether, in the context of the strangulation charge, the defendant intended to impede the victim's ability to breathe or to restrict her blood flow. It is not in dispute that the state bore the burden of proving beyond a reasonable doubt that the defendant intended to impede the ability of the victim to breathe or to restrict her blood circulation. General Statutes § 53a-64bb (a). "A person acts 'intentionally' with respect to a result . . . described by a statute defining an offense when his conscious objective is to cause such result . . . ." General Statutes § 53a-3 (11). As we frequently have observed, "[i]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences

drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 257, 681 A.2d 922 (1996).

The issue in the present case, then, is whether the uncharged misconduct evidence shed any light on the defendant's intent. Although the evidence related to the prior incident supported a finding that the defendant had strangled a female with whom he was familiar, the prior incident involving Schulman and the defendant was in all other respects separate and distinct from the circumstances of the crime charged. The prior incident involved a different victim—with whom the defendant was in an established, romantic relationship—and it occurred almost ten years prior to the incident at issue in the present case. Schulman testified that, during an argument of some type, the defendant choked and, later, choked her a second time, after she attempted to get help at a gas station. In the present case, the victim's testimony supported a finding that the defendant choked the victim after she indicated that she did not want to stay at his residence, thereby rejecting his invitation to engage in an intimate relationship. The testimony from Schulman was probative of the defendant's intent to harm Schulman, yet it did not shed any light on the defendant's attitude toward the well-being of the victim in the present case. The court stated that the evidence was admissible because it tended to explain that the defendant *understood* that he had the ability to use his hands to impede another person's ability to breathe and to restrict their blood flow and, thus, helped to demonstrate that he intended to harm the victim in this manner. We agree with the defendant that the uncharged misconduct evidence hardly could be viewed as especially probative with regard to his understanding of the consequences of wrapping his hands around the neck of another person and exerting force, consequences that we may presume are within the common knowledge of the average juror. Nor was the uncharged misconduct evidence probative with regard to whether the defendant intended to inflict those consequences on the victim in the present case, in different circumstances. In argument, the state suggested that the evidence was relevant not only to demonstrate that the defendant understood the consequence of his actions when he strangled another person, but the violent manner in which the defendant reacts when he is rebuked. To use evidence of the defendant's prior, violent conduct toward another victim as evidence that he acted similarly at a later time, however, suggests that the defendant had a propensity or criminal tendency to engage in such violent conduct.[14] Such use was impermissible in the present case. Conn. Code Evid. § 4-5 (a).[15]

Having determined that the uncharged misconduct evidence was not so connected to the present case as to be relevant to the issue of intent, and that the court

thus erred by admitting the evidence, we next turn to whether the error was harmless or whether it warrants reversal of the defendant's conviction. "[W]hether [an improper evidentiary ruling that is not constitutional in nature] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 18–19, 6 A.3d 790 (2010). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Badaracco*, 156 Conn. App. 650, 674, 114 A.3d 507 (2015).

Although Schulman did not testify in a manner entirely consistent with the state's proffer, there were no issues of surprise to the defense with respect to the uncharged misconduct evidence. Yet, the obvious danger to the defendant posed by the evidence was that it would tend to arouse the hostility of the jury because it portrayed him as a person with a criminal tendency, or propensity, to engage in domestic violence involving the strangulation of women. There are several factors, however, that weigh against a conclusion that the jury was unduly prejudiced by the evidence or that the evidence swayed the jury in reaching a verdict. First, in the context of a trial in which the presentation of evidence lasted for four days, the presentation of the uncharged misconduct evidence was brief and did not create side issues that potentially could have distracted the jury from the central issues before it.[16] Second, the evidence was not a prominent part of the state's case. The prosecutor referred to Schulman's testimony only once during her closing argument.[17] Third, the evidence related to the incident involving Schulman was remote in time, and, in terms of its impact, the evidence was not more egregious in nature than the evidence related to the incident in the present case. See, e.g., *State* v. *Allen*, 140 Conn. App. 423, 440–41, 59 A.3d 351 (uncharged misconduct evidence not unduly prejudicial when not more egregious than evidence related to charged misconduct), cert. denied, 308 Conn. 934, 66 A.3d 497 (2013).

Fourth, apart from the uncharged misconduct evidence, the state's case was very strong. There was no dispute as to the defendant's identity as the victim's attacker; the defendant's defense rested on disputing the severity of the victim's injuries and his intent in causing them. Accordingly, he argued for a conviction on lesser charges.[18] In evaluating the strength of the state's case, we observe that the state presented a great deal of evidence, including photographic evidence, of the victim's serious physical injuries, as detailed previously in this opinion. Moreover, both the victim and the defendant's neighbor, Litz, testified that, during the incident, the defendant expressed an intent to kill her. The evidence of the physical condition of the victim's neck following the incident, which included photographs that depicted significant bruising to her neck, strongly corroborated the victim's testimony that she had been strangled.

Finally, we observe that the court provided the jury with detailed limiting instructions both immediately before and immediately after Schulman testified, as well as additional instructions related to the evidence during its jury charge. The court's contemporaneous instructions were tailored to prevent the jury from viewing the uncharged misconduct evidence as evidence of the defendant's violent criminal nature. Rather, they guided the jury to consider the uncharged misconduct evidence solely in determining his intent to strangle in the present case. In light of the nature of the evidence at issue, and in the absence of any indication to the contrary, we will presume that the jury followed the court's instructions in the present case. *State* v. *James G.*, 268 Conn. 382, 397–98, 844 A.2d 810 (2004).

In light of the foregoing, we are left with a fair assurance that the court's erroneous admission of uncharged misconduct evidence did not substantially affect the jury's verdict. Thus, the defendant has failed to demonstrate that the error was harmful.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court granted the defendant's motion for a judgment of acquittal with regard to one count of using drug paraphernalia in violation of General Statutes § 21a-267 (d). The court imposed a total effective sentence of fourteen years of incarceration, followed by six years of special parole.

[2] The defendant's claim implicates the aspect of double jeopardy protection that precludes the imposition of multiple punishments for a single offense. "[T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown* v. *Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977). The record reflects that the defendant, in fact, was punished for both of the offenses at issue. The court sentenced the defendant under count one, which charged him with assault in the second degree, to a seven year term of incarceration, followed by three years of special parole. The court sentenced the defendant under count three, which charged him with strangulation in the second degree, to a seven year term of incarceration followed by three years of special parole. The court's sentence under count three runs consecutive to the sentence that it imposed under count one, and concurrently with the

sentence that it imposed under counts two and four.

[3] "Although the [trial] court loses jurisdiction over [a] case when [a] defendant is committed to the custody of the commissioner of correction and begins serving [his] sentence . . . [Practice Book] § 43-22 embodies a common-law exception that permits the trial court to correct an illegal sentence or other illegal disposition. . . . Thus, if the defendant cannot demonstrate that his motion to correct falls within the purview of § 43-22, the court lacks jurisdiction to entertain it. . . . [I]n order for the court to have jurisdiction over a motion to correct an illegal sentence after the sentence has been executed, the sentencing proceeding [itself] . . . must be the subject of the attack. . . . [T]o invoke successfully the court's jurisdiction with respect to a claim of an illegal sentence, the focus cannot be on what occurred during the underlying conviction. . . .

"Connecticut courts have considered four categories of claims pursuant to § 43-22. The first category has addressed whether the sentence was within the permissible range for the crimes charged. . . . The second category has considered violations of the prohibition against double jeopardy. . . . The third category has involved claims pertaining to the computation of the length of the sentence and the question of consecutive or concurrent prison time. . . . The fourth category has involved questions as to which sentencing statute was applicable. . . . [I]f a defendant's claim falls within one of these four categories the trial court has jurisdiction to modify a sentence after it has commenced. . . . If the claim is not within one of these categories, then the court must dismiss the claim for a lack of jurisdiction and not consider its merits." (Citations omitted; internal quotation marks omitted.) *State* v. *St. Louis*, 146 Conn. App. 461, 466–67, 76 A.3d 753, cert. denied, 310 Conn. 961, 82 A.3d 628 (2013).

[4] General Statutes § 53a-64bb (b) provides: "No person shall be found guilty of strangulation in the second degree and unlawful restraint or assault upon the same incident, but such person may be charged and prosecuted for all three offenses upon the same information. For the purposes of this section, 'unlawful restraint' means a violation of section 53a-95 or 53a-96, and 'assault' means a violation of section 53a-59, 53a-59a, 53a-59b, 53a-59c, 53a-60, 53a-60a, 53a-60b, 53a-60c, 53a-61 or 53a-61a."

[5] The defendant alleges a violation of his rights under the state and federal constitutions. He analyzes his claim under the framework set forth in *Blockburger*, which emanates from federal double jeopardy jurisprudence, and he does not suggest that the state constitution affords him any greater protection with respect to his double jeopardy rights. We observe that this court and our Supreme Court have held that with respect to the protection against double jeopardy, the state constitution does not afford greater protection than that afforded by its federal counterpart. See, e.g., *State* v. *Michael J.*, 274 Conn. 321, 354, 875 A.2d 510 (2005) ("Connecticut appellate courts never have held that the double jeopardy guarantees implied in the state constitution exceed those embodied in the federal constitution"); *State* v. *Laws*, 37 Conn. App. 276, 295, 655 A.2d 1131 (1994) ("we decline the defendant's invitation to find that our state constitution affords any greater due process rights than those afforded under the federal constitution's double jeopardy clause"), cert. denied, 234 Conn. 907, 659 A.2d 1210 (1995).

[6] In its long form information, the state alleged in count one that the defendant committed assault in the second degree "in the area of . . . 5 Bilton Road in the town of Somers, on or about the 12th day of May, 2012, at approximately 2:44 a.m., with intent to cause serious physical injury to [the victim] . . . ." The state alleged in count three that the defendant committed strangulation in the second degree "in the area of . . . 5 Bilton Road in the town of Somers, on or about the 12th day of May, 2012, at approximately 2:44 a.m., [in that he] restrained another person by the neck and throat with the intent to impede the ability of such other person to breathe and restrict blood circulation of such other person, and he impeded the ability of such other person to breathe or restricted blood circulation of such other person, [the victim] . . . ." The state alleged that the offenses occurred at the same address and at approximately the same time, but these facts are not dispositive in our analysis of whether the offenses arose from the same act or transaction.

[7] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

[8] General Statutes § 53a-64bb (a) provides: "A person is guilty of strangulation in the second degree when such person restrains another person by

the neck or throat with the intent to impede the ability of such other person to breathe or restrict blood circulation of such other person and such person impedes the ability of such other person to breathe or restricts blood circulation of such other person."

[9] In addition to seeking review of his double jeopardy claim under *Golding*, the defendant summarily states that "this issue is also reviewable under the plain error doctrine." Although we have reviewed the claim under *Golding*, which makes it unnecessary to undertake an analysis for plain error, we observe that the defendant has not set forth any analysis under the plain error doctrine.

[10] The court stated: "All right. Ladies and gentlemen, you're going to hear the testimony from a witness about an incident she had with the defendant that took place years before the events at issue in this case.

"The evidence is not being offered to prove the bad character, propensity, or criminal tendencies of the defendant. It is being offered for two specific limited purposes and may only be considered by you for those purposes.

"First, as I mentioned to you at the outset of this trial, the state has the burden of proving beyond a reasonable doubt each of the elements of the crimes it claims the defendant committed. One element of four of the crimes is that the defendant specifically intended to do what he is charged of doing.

"More particularly, in count 3 of the information, which charges strangulation in the second degree, the state must prove beyond a reasonable doubt that the defendant specifically intended to impede [the victim's] ability to breathe and to restrict her blood flow.

"The testimony of the witness you are about to hear from is being offered by the state [as] evidence that, when committing whatever actions you find the state has proven beyond a reasonable doubt, if any, the defendant had the specific intent required for count 3.

"In addition, the state is offering the testimony as evidence of the defendant's motive for committing the acts alleged by the state with regard to [the victim].

"You may consider this evidence for these two purposes and these two purposes only. And you may consider the evidence for these limited purposes if you believe it and further find that it logically and rationally supports the issues for which it has been admitted, but only as it may bear on those issues.

"Even if you so conclude, evidence of a prior offense or other conduct on its own is not sufficient to prove the defendant guilty of the crimes charged in the information.

"Bear in mind as you consider this evidence that at all times the state has the burden of proving the defendant committed each of the elements of the offense charged in the information beyond a reasonable doubt.

"I remind you that the defendant is not on trial for any act, conduct, or offense not charged in the information. You may not find him guilty of the crimes charged merely because you believe that he committed or may have committed other conduct for which he has not been charged here.

"In addition, you . . . may not consider the evidence as establishing that the defendant has a predisposition or propensity to commit any of the crimes charged.

"In summary, you may not consider evidence of other misconduct of the defendant for any purpose other than the ones I have just told you because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the other alleged misconduct.

"For this reason, you may consider this evidence only on the issue of the defendant's intent and motive with respect to the charge of strangulation in the second degree and for no other purpose."

[11] The court stated: "Ladies and gentlemen, in light of Ms. Schulman's testimony, I'm going to revise my instruction to you in one way.

"You may only consider her testimony as to the issue of intent, not as to the issue of motive. She testified that she couldn't recall what led to the event so, consequently, her . . . testimony, even if you believe it, would be completely irrelevant to the issue of motive, and you are not to consider it for that.

"You may only consider it as to the issue of intent if you find it believable and you further find that it . . . naturally . . . logically and rationally supports the issue for which it has been admitted and for no other purpose as . . . you'll follow this instruction.

"I will give you this instruction again at the end of the case because it's an important issue that you only consider it for that limited purpose." The court delivered a similar instruction during its jury charge.

[12] It appears that the defendant's attorney in referring to the passage of more than ten years was calculating the length of time between the incident in October, 2002, and the date that Schulman had testified in the defendant's

trial, December 13, 2013.

[13] Following the jury's verdict, the defendant brought a motion for a new trial that was based on the court's admission of the prior uncharged misconduct evidence. At a posttrial hearing on the motion, the court denied the motion and explained: "I instructed the jury before she testified. She testified somewhat differently than I think the state expected her [to] testify, and as a result of that, I further limited what the jury could consider her testimony for and told them that something I thought they could consider it for, they no longer could. I . . . reinforced that limiting instruction in my final charge to the jury, and I remain convinced that that ruling was the proper ruling."

[14] Evidence of prior uncharged misconduct that is related to the victim of the crime charged may be used to help explain the defendant's intent in connection with the crime charged. See, e.g., *State* v. *Millan*, 290 Conn. 816, 830–31, 966 A.2d 699 (2009) (uncharged misconduct involving victim admitted to demonstrate defendant's intent to harm victim); *State* v. *Donald H. G.*, 148 Conn. App. 398, 409, 84 A.3d 1216 (uncharged misconduct involving victim admitted to demonstrate defendant's "lustful inclinations" toward victim), cert. denied, 311 Conn. 951, 111 A.3d 881 (2014). When, however, evidence of uncharged misconduct is separate and distinct from the crime charged, "the use of uncharged misconduct to prove intent is problematic because it is practically indistinguishable from prohibited propensity evidence. Uncharged misconduct may logically be used to rebut a claim of mistake or no knowledge . . . but to use misconduct at one time to prove an intent to do the same thing at another time borders on the forbidden theme of 'once a thief always a thief.' " (Citation omitted.) C. Tait & E. Prescott, supra, § 4.19.6, pp. 186–87.

[15] In light of our assessment of the evidence, it follows that the court erroneously concluded that its prejudicial nature did not outweigh its probative value. The evidence was prejudicial in that it suggested that the defendant had a history of domestic abuse involving another female and, for that reason, tended to suggest that the defendant acted in a consistent manner in the present case.

[16] The state's examination of Schulman comprises approximately six pages of the trial transcript. The defendant's cross-examination of Schulman comprises less than one page of the trial transcript. The evidentiary portion of the trial comprises more than five hundred pages of the trial transcript.

[17] In discussing the elements of strangulation in the second degree, the prosecutor argued: "You can infer what [the defendant's] intent was . . . because of what he had done in the past. Suzanne Schulman testified that the defendant choked her until she turned blue. It was the color of her skin turning blue that made him stop."

[18] Thus, the defendant's attorney argued that the evidence demonstrated that the defendant was guilty of assault in the third degree, strangulation in the third degree, breach of the peace, and threatening.